# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

CEDRICK JONES,

       Plaintiff,

v.                                          CASE NO.  4:14cv15-RH/CAS

CAPITAL TRANSPORTATION INC.,

       Defendant.

_____/

## AMENDED ORDER UPHOLDING THE JURY VERDICT

This is a case of old-fashioned, deliberate, sometimes overt discrimination based on race.  The jury returned a modest verdict for the plaintiff.  Ignoring much of the evidence, the defendant has moved for judgment as a matter of law, for a new trial, or for a remittitur.  This order denies the motions.

## I

The defendant Capital Transportation, Inc., operated a taxicab business in a single location: Tallahassee, Florida.  Capital's general manager, Richard Tull, was white.  When he started, the other front-office employees were African American.  Mr. Tull promoted a white employee to be his secretary (even though she had not

applied for the position), rejecting a more qualified African American who had applied. Mr. Tull promptly thanked his new secretary for "evening the playing field" and said he felt "outnumbered" and "ganged up on." Tr. 236-27, ECF No. 95 at 7-8.

Capital treated its taxicab drivers as independent contractors. The drivers kept a percentage of their fares. Some drivers owned their vehicles; others drove vehicles owned by Capital. Drivers with their own vehicles kept a higher percentage of their fares.

Customers sometimes requested a specific driver. When feasible, such requests were honored. More often, though, customers did not request a specific driver. This order refers to calls without a request for a specific driver as "unallocated" calls. Capital's dispatch operation assigned the driver who would respond to an unallocated call.

The plaintiff Cedrick Jones was a driver. He started in a typical sedan but decided to change to a wheelchair-accessible van. Capital had only two fulltime drivers of accessible vans. Mr. Jones believed there was enough work for another. Mr. Jones bought and equipped his own van.

Mr. Jones's tenure as an accessible-van driver did not go well. Mr. Tull put Mr. Jones's van through repeated inspections before finally approving it. Once underway, Mr. Jones received calls producing substantially less revenue than the

other (white) fulltime van drivers.  One reason was that Mr. Tull directed specific calls away from Mr. Jones, giving various excuses.  At some point during Mr. Jones's tenure, Mr. Tull used the n-word to refer to Mr. Jones.

## II

Mr. Jones filed this action against Capital asserting a claim under 42 U.S.C. § 1981, which prohibits racial discrimination in contracting.  Capital defended on the ground that it did not engage in racial discrimination.  Capital said that unallocated calls for an accessible van were assigned to the three fulltime van drivers on a rotating basis.  Other than customer requests for a specific driver or a driver's unavailability at the time of a call, Capital proffered no other reason for any disparity in calls or revenues among the van drivers.

The highest volume of calls for accessible vans came to Capital from institutional providers of healthcare services.  One was the Veterans Administration.  During this litigation, Mr. Jones requested production of records showing calls and revenues for van drivers.  Capital produced records only for VA calls, not for calls from other institutional providers.  Rather simplistically, Capital compiled statistics showing that Mr. Jones received more VA calls than the other van drivers, but the records showed that on the more important measure— revenues—Mr. Jones lagged well behind the other drivers.  The record showed that

the other drivers received the more lucrative, longer transports, while Mr. Jones got the leftovers.

After a full and fair trial, the jury returned a verdict explicitly finding that "race [was] a motivating factor in Capital Transportation's assignment of calls to the drivers of accessible vans" and that if race had not been considered, "Mr. Jones [would] have received more calls or revenue than he actually received." A taxicab company violates § 1981 when the company reduces a driver's calls or revenue because of the driver's race. So the verdict established that Capital violated Mr. Jones's rights under § 1981.

The jury awarded $53,500 in lost profits, no amount for mental and emotional anguish, and $196,500 in punitive damages.

## III

Capital challenges the verdict through two motions, each as now amended. Capital asserts that Mr. Jones failed to prove racial discrimination, that there was no basis for an award of punitive damages, that the punitive-damages instruction was erroneous, that the punitive-damages award was excessive, that it was error to allow Mr. Tull's secretary to testify that Mr. Tull used the n-word to refer to Mr. Jones because the secretary could not recall the date when that happened and it might have been after the discrimination at issue, and that it was error not to allow Capital's attorney to "impeach" the secretary with deposition testimony (the

"impeachment" was not allowed because the deposition testimony was not inconsistent with the testimony the secretary gave at the trial).

IV

On Capital's motion for judgment as a matter of law, the evidence must be viewed in the light most favorable to Mr. Jones.  *See, e.g.*, *Howard v. Walgreen Co.*, 605 F.3d 1239, 1242 (11th Cir. 2010).  The facts are set out above in that light.  The issue of whether the evidence was sufficient to go to the jury is not close.

Capital does not deny that assigning Mr. Jones fewer or less lucrative calls because of his race would violate § 1981.  Mr. Tull ran the operation.  Capital elicited the testimony of Mr. Tull's secretary that he was a "blatant racist."  She heard him refer to Mr. Jones with the n-word.  She heard him direct business away from Mr. Jones and to the other (white) van drivers.  This is not direct evidence that race was a factor in the assignment of calls, but it is persuasive circumstantial evidence.  If evidence like this is not enough, § 1981 and other discrimination statutes will be a dead letter, or nearly so.

The documentary evidence—together with the lack of other documentary evidence—strongly supports this conclusion.  Capital kept records of calls and revenues but says most of the records became inaccessible in computer upgrades.  Capital somehow was able to produce records for VA calls but not calls from other

institutions.  The VA records showed that Mr. Jones received markedly less revenue from VA calls than the other van drivers received.  And the jury's handling of the records shows how diligently the jury did its job.  The VA receipts were copied three or four to a page.  The jury asked and received permission to cut up the exhibits into individual receipts.  ECF No. 84 at 3-4.  The jury sorted the receipts by driver, counted them, totaled the revenues, and calculated each driver's average revenue per call, all as shown by the jury's notes on the exhibit.  Pl. Ex. 37.  Mr. Jones's average revenue per call was far below that of the other drivers.  To this day, Capital has offered no explanation for the substantial difference in the van drivers' revenues from VA calls.  Nor has Capital adequately explained its inability to provide data for other institutional providers.

Records on institutional calls were not the only unavailable records.  Capital kept contemporaneous records showing each driver's total revenues but failed to produce them in this litigation.  The record includes testimony of an employee who saw the records; the employee said the other van drivers' overall revenues far exceeded Mr. Jones's.  Capital has offered no credible explanation for the disparity.

To be sure, the other drivers had the van business to themselves before Mr. Jones entered the fray.  One or both of those drivers had a role in allocating calls, at least at the outset.  It would not be unusual for the incumbents to resist giving a

share of the calls to a newcomer, regardless of race. This could explain some or all of the disparity in calls and revenues. But Capital has not proffered this as an explanation. Quite the contrary. Capital has steadfastly insisted that calls were allocated by rotation, with no preference for any of the van drivers, and that there was simply no disparity in calls or revenues. It is an assertion that the evidence does not support and that the jury properly rejected.

V

On a motion for a new trial, unlike on a motion for judgment as a matter of law, a court can properly consider the weight of the evidence, not just its sufficiency. *See, e.g.*, *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 520 (11th Cir. 1988). This does not help Capital here, because the weight of the evidence squares with the verdict.

Capital challenged at trial, and challenges here, the credibility of Mr. Tull's secretary. Having presided over the trial, it surprised me not at all that the jury credited the secretary's testimony. She withstood an aggressive, almost mean-spirited cross-examination, and she did it with humility, equanimity, and grace. She seemed to recount accurately what she saw and heard—no more and no less. The jury was not required to credit her testimony, but it was free to do so if it chose.

# VI

A § 1981 plaintiff may recover punitive damages against a corporation when
(1) an official "high up in the corporate hierarchy" (2) intentionally discriminates
against the plaintiff based on race (3) in a way that clearly and undeniably violates
the law—that is, maliciously or with reckless indifference to the plaintiff's federal
rights. *See, e.g.*, *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 900-01 (11th Cir. 2011)
(citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002)).
Capital asserts these standards were not met and that the jury instructions did not
properly frame the issues. Capital is wrong on both counts.

The jury was properly instructed that it could award punitive damages only
if the first two of these three prerequisites were met. The jury was not instructed
on the third prerequisite because, in the circumstances of this case, this was an
issue of law, not fact. This order addresses the three prerequisites in turn.

First, Capital is a subsidiary of a parent corporation. For reasons of its own,
the parent chose to have a separate subsidiary—Capital—that operates exclusively
in Tallahassee. The critical question thus is not whether Mr. Tull was "high up in
the [parent's] corporate hierarchy," but only whether Mr. Tull was "high up in
[Capital's] corporate hierarchy." On instructions that were not and still have not
been challenged, the jury resolved this issue for Mr. Jones, as the jury was entitled

to do.  Mr. Tull's title was general manager, he was the highest corporate official on the scene in Tallahassee, and he managed all of Capital's day-to-day operations.

Second, as set out above, the evidence was easily sufficient to go to the jury on the question of whether Mr. Tull intentionally discriminated against Mr. Jones based on race.  The jury resolved this issue for Mr. Jones, as it was entitled to do. If, as the jury found, this was intentional discrimination based on race, then it was not only intentional discrimination but also clearly illegal, indefensible racial discrimination.  It was, in short, the stuff for which punitive damages are made.

Third, it is true, as Capital now asserts, that punitive damages are not appropriate in every case in which a § 1981 plaintiff shows intentional discrimination.  *Cf. Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) (addressing 42 U.S.C. § 1981a(b)(1), a statute that does not apply to § 1981 claims but sets out a substantively identical punitive-damages standard: such damages may be awarded against a person who "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual").  Sometimes a defendant reasonably believes, albeit wrongly, that challenged conduct comports with the law.  One example occurs in the penumbra of affirmative action; a defendant may act intentionally but without knowing the action is illegal.  Another example—one encountered more often in gender cases—arises from an alleged bona fide

occupational qualification; again, a defendant may act intentionally but without knowing the action is illegal. In circumstances like these, a defendant does not act maliciously or with reckless indifference to a plaintiff's federal rights; punitive damages are improper. But nothing like that was involved here. If Mr. Tull intentionally discriminated against Mr. Jones based on race—steering more lucrative calls to the white drivers and the left-overs to Mr. Jones because of his race—then Mr. Tull acted in undeniable violation of Mr. Jones's federal rights.

The applicable jury instruction told the jury that it could award punitive damages only if it found that Mr. Tull was high up in Capital's corporate hierarchy and that he intentionally discriminated against Mr. Jones based on race. The instruction was correct, and Capital asserted no objection. Now, having suffered an adverse verdict, Capital has changed course. Capital says the § 1981a(b)(1) language should have been added—the jury should have been told it could award punitives only on a finding of malice or reckless indifference to federally protected rights. But this would have made no difference in the outcome; having found intentional discrimination, this jury surely would have labeled the conduct malicious or at least recklessly indifferent if asked to do so.

Moreover, Capital still has not suggested how Mr. Tull could have intentionally discriminated against Mr. Jones based on race without acting maliciously or with reckless indifference to Mr. Jones's federally protected rights.

The object of jury instructions is to present the factual disputes to the jury for its resolution based on the evidence, not to provide a set of instructions that would always be perfect in other cases with different factual disputes. This jury awarded punitive damages because it resolved the facts against Capital, not because the jury instructions used the word "intentionally" rather than "maliciously" or "with reckless indifference."

(It perhaps bears noting that when I circulated the first draft of jury instructions during the trial, *see* ECF No. 76, I did not include a punitive-damages instruction at all, because, to that point, it appeared that Mr. Tull ran only the Tallahassee location of a larger corporation; he was not "high up" in the hierarchy. I did not intend to let punitives go to the jury at all. But a corporate official later testified that the Tallahassee operation was separately incorporated—making Mr. Tull an official that a jury could reasonably find "high up." At that point, a punitive-damages instruction was added, in language that fairly framed the only factual disputes and to which neither side objected.)

Punitive damages are disfavored, and rightly so. But intentional racial discrimination is also disfavored, and rightly so. When a high-ranking official intentionally discriminates based on race in a way nobody could assert is legal, punitive damages may be awarded to punish the defendant and deter violations by others. Old-fashioned discrimination occurred here, complete with a vulgar racial

epithet and adverse employment actions. These circumstances provide an appropriate occasion for punitive damages.

The amount of the jury's award was modest and well within an acceptable range. *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 560 (1996) (setting out factors a court should consider in reviewing the amount of a jury's punitive-damages award); *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003) (upholding a substantially larger punitive damages award—comprising a higher multiple of compensatory damages—based on intentional racial discrimination no more egregious than here). Based on the *Gore* factors, and consistent with the decision in *Bogle*, I would not set aside or reduce the punitive-damages award, even if I had discretion to do so.

VII

The assertion that Mr. Tull's secretary should not have been allowed to testify that he used the n-word, because she could not give the date when that occurred, misses the mark. Under Federal of Evidence 401, evidence is relevant if it has "any tendency" to make a fact that is "of consequence in determining the action" "more or less probable than it would be without the evidence."

An adult who is racist in one year usually was racist in the prior year and usually will still be racist in the next year. Or so a reasonable juror could believe. Evidence that Mr. Tull used a vulgar racial epithet in 2012 to refer to Mr. Jones

makes it more likely that actions Mr. Tull took against Mr. Jones in 2011 resulted from intentional racial discrimination. So evidence of the racial epithet was relevant, even if, as Capital now asserts, the evidence put the remark in 2012, a year after the discriminatory allocation of van calls. Moreover, the probative value of the evidence was not "substantially outweighed" by any prejudicial impact. Quite the contrary. Evidence like this has significant probative value. This was no stray remark; this was a racial epithet used by the decision-maker himself. The only real issue was whether the evidence was true. That was not an issue of admissibility but an issue of credibility for the jury.

Finally, Capital now says it was improperly denied the ability to impeach the secretary with her deposition. Not so. Capital's assertion is this. The secretary said at her deposition that she did not remember the date when Mr. Tull used the n-word or the context. At trial, she said Mr. Tull used the n-word in reference to Mr. Jones. But this is not inconsistent. One may remember what was said and even who it was said about without remembering the date or context; it happens all the time. A nonparty witness can be impeached with deposition testimony inconsistent with testimony the witness gives at trial, but impeachment with testimony that is not inconsistent is improper.

In any event, Capital was given wide latitude to cross-examine the secretary and did so at great length.  The assertion that the additional proposed examination would have changed this verdict is wholly unrealistic.

VIII

For these reasons,

IT IS ORDERED:

The motions for judgment as a matter of law, new trial, or remittitur, ECF Nos. 92, 93, 100, and 101, are denied.

SO ORDERED on October 13, 2015.

s/Robert L. Hinkle
United States District Judge